**STATE OF NEW YORK by Robert ABRAMS, Attorney General, Plaintiff,**

v.

**ANHEUSER–BUSCH, INC., et al., Defendants.**

**No. 86 CV 2345.**

United States District Court, E.D. New York.

Jan. 14, 1993.

Robert Abrams, Atty. Gen., State of N.Y., New York State Dept. of Law by Timothy Cone, William L. Lanning, Robert F. Roach, and George W. Sampson, New York City, for plaintiff State of N.Y.

Peter E. Moll, Eberhard W. Pfaller, John J. Rosenthal, Brian D. Wallach, and Edwin H. Wheeler, Howrey & Simon, Washington, DC, for defendant Anheuser–Busch.

MEMORANDUM AND ORDER

PLATT, Chief Judge.

I. DECISION AND PRELIMINARY COMMENT

A. Decision

This is an antitrust action brought by the New York State Attorney General's Office

against Anheuser–Busch seeking injunctive relief under 15 U.S.C. § 1 and New York General Business Law §§ 340–47. The State challenges Anheuser–Busch's vertical non-price territorial restriction agreements, known as its 1982 Equity Agreement with its authorized wholesalers, charging that they unreasonably restrained trade, thus violating the above mentioned antitrust laws. For the reasons set forth below, we hold that the 1982 Equity Agreement is not an unreasonable restraint of trade and thus the State's complaint is hereby dismissed.

### B. Comment

Were it not for the Second Circuit Court of Appeals decision in *Eiberger v. Sony Corp. of America*, 622 F.2d 1068 (2d Cir. 1980), we would have granted defendant's motions heretofore made herein for summary judgment on the grounds that the State has been unable to show at any time in this proceeding a relevant geographic market or possession by the defendant of market power as is apparently necessary under *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (hereinafter "*Sylvania*"), and its progeny hereinafter discussed. *Eiberger*, however, arguably holds that a vertical restraint may be unreasonable without a finding that a plaintiff has shown a relevant geographic market or possession of market power and that there must be a trial to weigh the interbrand benefits against the intrabrand effects of any restraint caused by a restrictive agreement. It is for that reason, even though in the case at bar the defendant clearly articulated and showed on its summary judgment motion some material procompetitive effects of its agreements, that we felt the protracted trial which we held herein to be necessary. There are authorities and suggestions in other cases and articles that a showing of some material procompetitive

effects under such circumstances should be sufficient to satisfy the rule of reason and that the balancing otherwise necessarily required herein is not necessary.[1] A clarification on this point would not only be helpful but would also save future litigants and the district courts inordinate amounts of time and effort and money.

## II. PROCEDURAL BACKGROUND

This case concerns an action commenced by the State of New York on July 15, 1986, against four brewers, Anheuser–Busch, Inc. (hereinafter "A–B"); Miller Brewing Company; Stroh Brewery Company; and G. Heileman Brewing Company; four named and an unspecified number of authorized wholesalers; and a beer wholesalers' trade association. The action challenged the brewers' use of wholesaler-assigned exclusive territories to distribute their products.

In July 1989, by stipulation and order, the Court dismissed all claims with prejudice against G. Heileman and Stroh and the wholesalers' association. A–B, Miller and various wholesalers moved for summary judgment against the State and the State similarly cross-moved. In an Order filed September 19, 1990, the Court denied each summary judgment motion. In September 1991, a stipulation and order dismissing with prejudice all claims against Miller was signed by the Court. Through these stipulations brewers Stroh, Heileman and Miller were permitted to continue utilizing their vertical restraints without alteration and without fear of future State action. Subsequent to the commencement of the trial, all claims against the defendant wholesalers were also dismissed with prejudice by stipulation and order. As a result of these settlements, the present matter concerns only the State's claim against Anheuser–Busch. At the close of the State's case, A–

---

1. There is also some support for the proposition that even without market power vertical restraints may reduce interbrand competition by facilitating cartelizing. *Sylvania* 433 U.S. 36, 51 n. 18, 97 S.Ct. 2549, 2558 n. 18, (citing Posner, *Antitrust Policy and the Supreme Court: An Analysis of Restricted Distribution, Horizontal Merger and Potential Competition Decisions*, 75 Colum.L.Rev. 282, 294 (1975); *see also* Arquit, *Market Power in Vertical Cases*, 60 Antitrust L.J. 921 (1992)). Nonetheless, the Supreme Court in *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 725–726, 108 S.Ct. 1515, 1520, 99 L.Ed.2d 808 (1988), stated that support for the cartelization proposition "was and remains lacking."

B filed a motion for involuntary dismissal pursuant to Fed.R.Civ.Pro. 41(b). This motion was denied on January 2, 1992.

## III. FACTUAL FINDINGS

### A. The National Beer Market

Anheuser–Busch brews and distributes for sale in New York State (and indeed throughout the country) a number of brands of beer including Budweiser, Bud Light, Bud Dry, Michelob, Michelob Light, Michelob Dry, Michelob Dark, Busch, Busch Light, Natural Light, O'Douls, and King Cobra. Although a major participant in the national beer market for years, (in 1971 A–B accounted for 18.6% of all national beer sales), A–B has developed into the nations's leading producer of beer products and by 1989 it held a 42% share of the national market and a 39% share of the New York State market. (Def.Ex. AB–WB; AB–WC).

### B. Beer Sales in New York State

In the early 1970s, much of the beer sold in New York State was brewed in this State, under brand names such as Schaefer, Ballantine, Rheingold, and Genesee. By the 1980s, with the exception of Genesee, none of those brands accounted for a significant share of sales. Instead, A–B and Miller, both lesser producers in the early 1970s, together with Genesee, had become the leading brewers, combining for approximately 58% of the sales in New York State in 1982. (Def.Ex. AB–WC). As defendant's expert Myslinski[2] and State's expert Bradburd[3] testified at trial, A–B's rising popularity and the demise of some of its competitors can be, in part, attributed to divergent attitudes towards producing a quality product. (Tr. 3180–3182, 3189; Def.Ex. AB–EN at 125278; Tr. 3402; Pl. Ex. 378, Busch Dep. at 63; Tr. 1747–49, 2834; Def.Ex. AB–MK; Tr. 3781–3783).

By 1989, the landscape of the beer market had continued to transform, with each brewer's share of the total beer sales in New York State split as follows:

A–B: 39% share;
Miller: 14.6% share;
Genesee: 7.5% share;
Coors: 7.1% share;
Heileman: 6.9%
Stroh/Schlitz: 5.5%
Pabst: 4.0%
Imports: 12.9%
All Other Domestics: 2.6%. (Def.Ex. AB–WC).

In addition to the changing fortunes of existing brands, the New York market has witnessed the entry of numerous new brands, most notably Coors, which began selling in the State in 1987 and obtained 7.1% of the State's total beer sales by 1989. During the 1980s, some 10 to 15 new brands of beer were introduced in the State of New York each year. Some of the successful new entrants include: Corona and Amstel Light, as well as micro-brewery products Samuel Adams, New Amsterdam and Brooklyn Lager. (Tr. 2797–2802, 3377–2278). In addition to the new products from other brewers, in the past 15 years A–B has introduced numerous new brands, such as Busch, Busch Light Draft, King Cobra, Michelob Dry, Bud Light, Bud Dry, and O'Douls, while Miller has introduced Miller Lite, Milwaukee's Best, Meister Brau and Miller Genuine Draft. A–B's share of the total beer sales in New York State is not, nor has it ever been, consistent throughout different regions of the State. (Uncontested Facts ¶ 132–134). Sales in the New York Metropolitan Area[4] account for over 50% of the A–B's total State sales and comprise a higher market share than do A–B's total sales in the rest of the State. For instance, A–B's most popular products, Budweiser and Bud Light, accounted for

---

**2.** Dr. William C. Myslinski is a former director of economics at the Antitrust Division of the U.S. Department of Justice who has had extensive experience studying the beer industry.

**3.** Professor Ralph Bradburd is a professor of economics at Williams College. The Professor was called as the State's rebuttal witness.

**4.** For the purposes of this case, the New York Metropolitan Area is comprised of New York City, and Westchester, Nassau and Suffolk Counties.

30.85% of the total share in the New York Metro area from 1987–1991, but only 18.98% of the total beer sales in Albany, and 10.20% of the sales in Buffalo. (Def.Ex. AB–VE).

## C. Distribution of A–B Beer

Beer is a perishable product with a shelf-life of up to 105 days.[5] Like the vast majority of brewers, A–B utilizes a date coded system to track the freshness of their product.[6] Each container is marked in a manner unintelligible to the consumer, leaving the consumer unable to learn the freshness of the product before purchase. This serves to prevent customers from shuffling through stock searching for the freshest product, leaving the older, yet still fresh, beer to sit past its expiration date. (Tr. 2443–2446, 3845–3846). Only one brewer, Samuel Adams, was shown to utilize a consumer-intelligible dating system. (Tr. 2179–2180; Pl.Ex. 474).

The demand for A–B products varies throughout the year, reaching peaks during the summer months and the holiday season at the end of the year. A–B's brewing capacity is not sufficient to produce the quantity of beer demanded during peak periods of the year. Combined with the perishable nature of the product, this fluctuating demand and limited production capacity makes production and inventory planning and control necessary to insure sufficient product supply during the peak periods. (Tr. 2012–2017).

Beer is generally distributed through a three-tiered system—brewer to wholesaler to retailer. In New York, however, due to its unique licensing laws, a layer of sub-distributors (known as "home distributors") exists in certain areas, adding extra tiers to the system. Depending on the type of license obtained, these home distributors may sell beer either at wholesale only or at wholesale and/or retail. Home distributors exist independently of any specific producer and are not contractually obligated to distribute A–B's or any other brewer's product. They are not permitted to purchase beer directly from the brewery and must rely on the brewer's authorized wholesalers or other home distributors for their supply.

By 1983, with the addition of a new brewing facility in Baldwinsville, New York, A–B had twelve breweries in the United States. As stated above, these breweries do not sell beer directly to retail customers, rather they sell only to A–B authorized wholesalers. Each authorized wholesaler is assigned to a source brewery, from which it obtains the vast majority of its supply. For New York State authorized wholesalers there are two possible source breweries; the A–B brewery in Baldwinsville, New York, services most of A–B's upstate wholesalers and some of the Metro wholesalers and its facility in Newark, New Jersey, services many of the downstate authorized wholesalers. (Uncontested Facts ¶ 11; Tr. 2019, 2022).

Of their 900 nationwide authorized wholesalers, A–B has 34 located in New York State and six within the New York Metropolitan Area. Each wholesaler is assigned an area in which to focus its sales. Upon purchasing beer from the brewery the wholesalers sell the beer to retailers and/or home distributors who are located in their assigned areas. In areas with numerous home distributors, it is not unusual for beer to be transferred between two or more home distributors before it reaches the retailer. With home distributors transferring products among themselves, in regions like the New York metropolitan area where home distributors are particularly concentrated,[7] beer is often distributed through a four-, five or more tier system

---

**5.** The maximum shelf-life of A–B products varies by brand and package. The shelf-life for Budweiser packaged in cans and bottles is 105 days, while the shelf-life for Michelob in cans and bottles is 75 days. The maximum shelf-life for all A–B brand draught beer is 45 days.

**6.** The containers may be marked by either numbers under the so-called "Julian" system if the container is an aluminum can, or a series of notches, if the container is a bottle or keg.

**7.** More than 70% of the more than 500 home distributors are within the territories of A–B's six authorized New York Metro wholesalers. (Uncontested Facts ¶ 35).

before it reaches the consumer. In areas such as upstate New York, which are without home distributors, A–B beer is distributed directly from the wholesaler to the retailer. (Tr. 2339–2340). Retailers, in turn, sell to consumers for consumption on-premise (bars, restaurants, stadiums) or off-premise (supermarkets, delis, convenience stores).

The activities of the authorized wholesaler do not cease upon completion of a sale. Wholesalers must service each account to which they sell A–B beer. "Servicing" an account involves monitoring the stock rotation and freshness of the A–B beer possessed by the retailer (Tr. 2095–2099); destroying and replacing any overage beer (Tr. 1758; Pl.Ex. 377, Britt Deposition at 28, 187); installing and maintaining "point-of-sale" materials [8]; and regularly checking on the account by delivery salesmen and sales supervisors (Tr. 2107–2108). The importance of properly servicing an account is exemplified by the battle among producers to gain optimum shelf space and tap placement in retail establishments. (Tr. 3404–3405, 3334–3335, 3348–3350). Although the amount of a certain brand of beer purchased by the retailer will depend largely on the demand by consumers for that product, through attractive offers of packages and services a wholesaler can make certain beer more desirable for retail purchasers. (Tr. 3404–3405). By inducing its wholesalers to make its product more appealing to retailers, a producer can help increase consumer sales of the product.

The unique existence in New York of home distributors has also invigorated the practice of "transshipping". In the beer industry, "transshipping" refers to the sale of beer out of the geographic area or territory assigned to an authorized wholesaler. In New York State, this practice arises when an authorized wholesaler sells to an in-territory home distributor which, in turn, sells (transships) the beer to an account located outside the wholesaler's territory.[9] Transshipped beer is attractive to retailers because it is often offered at a lower price and transshippers, unlike authorized wholesalers, can deliver brands produced by more than one brewer. (Tr. 139–143, 585–586). However, due to the scarcity of home distributors in much of the State, no appreciable amount of transshipping occurs outside the Metro New York Area. (Tr. 2063–2064, 2422–2423). As of 1982, the only A–B products which were being transshipped were Budweiser, Michelob, Michelob Light and Natural Light, with Budweiser accounting for 90% of the transshipping transactions.

D. The Equity Agreement

In 1967, A–B became the first national brewer to enter into a uniform written agreement not just in New York but with all its authorized wholesalers nationwide, replacing a terminable at-will arrangement under which beer was purchased on an order-to-order basis. The stated purpose of this "Equity Agreement" was to promote investment and long-term commitment from the wholesaler by giving them an equity in their business. The agreement was imposed uniformly nationwide and signed by each of A–B's 900 authorized wholesalers. Since 1967, the Equity Agreement has been amended twice, once in 1974 and again in 1982. It is the terms of the 1982 amendments and their imposition of exclusive territories on A–B's wholesalers that New York State contests as an unreasonable restraint of trade. (Complaint ¶ 42).

A–B amended the 1967 Equity Agreement in 1974. The 1974 amendments assigned each authorized wholesaler a territory of primary responsibility in which to concentrate its selling, servicing and promotional efforts.[10] Certain provisions pro-

---

**8.** Point-of-sales materials can be lamps, neon and other signs, sports schedules, stickers, posters, and table tents. (Tr. 2110–2112).

**9.** Although transshipping is a New York phenomenon, much of the beer transshipped into Metro New York originates from the Newark, New Jersey brewery.

**10.** The first paragraph reads:
AREA OF PRIMARY RESPONSIBILITY: Wholesaler agrees to exercise its best efforts to promote, sell and service Anheuser–Busch's

vided sales and merchandizing objectives, and directed the wholesalers to work towards achieving maximum market representation of A–B products in their area.

Eight years later, in 1982, A–B decided to amend again the Agreement by including, among other new provisions, an exclusive territory provision. A–B was the first brewer in New York to implement exclusive territories. However, presently most other major brewers [11] and numerous state legislatures require such a system. New York is one of only nine states without any statute or regulation addressing exclusive territories for beer distribution. The alcoholic beverage control laws of 30 states (i.e., 60% of the states) mandate (i.e., require) exclusive territories and prohibit wholesaler sales outside the brewer-assigned territories.[12] Ten more states expressly permit (i.e., a total of 80% of the states) brewer assigned territories for beer distribution.[13] Only one State, Indiana, expressly prohibits exclusive territories for beer distribution.

As with the previous revisions, the 1982 amendments were uniform for all of A–B's authorized wholesalers nationwide. The amendments were unilaterally imposed by A–B, as A–B executives informed the wholesalers of the new policy, explained their reasons for the amendments, and required each authorized wholesaler to sign the new agreement. On its face, the Agreement seemed to prescribe that any wholesaler who violated the terms of the Agreement by selling outside of its assigned territory was subject to termination, although there was no evidence that any wholesaler has been terminated for failure to abide by the terms of the Equity Agreement.

The exclusive territory clause of the 1982 Agreement provided:

"Anheuser–Busch hereby appoints Wholesaler as the wholesale distributor of, and grants to Wholesaler the right to sell, the Products in the territory described in Exhibit 2 ('Territory') and agrees that it will not appoint another wholesaler for the Products sold by Wholesaler in the Territory.... Wholesaler hereby accepts said appointment and agrees to exercise its best efforts to promote, sell and service the Products in the Territory. *Wholesaler agrees that it will not sell Products directly or indirectly to customers located outside the Territory;* provided, however, that Wholesaler may, subject to the approval of Anheuser–Busch, sell Products to customers located in another wholesaler's territory if that wholesaler is unable for any reason to service its territory...."

(Def.Ex. A–A) (emphasis added).

In addition to the exclusive territory provision, the 1982 Agreement also (1) required wholesalers to have controlled environment warehouses ("CEW"); (2) required beer to "come-to-rest" within the authorized wholesaler's CEW to ensure proper storage and stock rotation; (3) required beer to be shipped out of wholesalers warehouse on a "first in, first out" basis; (4) instituted a successor management proce-

---

Products in the geographic area designated on Exhibit 1 as **Wholesaler's primary market area.** Wholesaler shall be primarily responsible for servicing retail accounts in its primary market area with Anheuser–Busch Products and will be expected to concentrate its efforts in that area. It is understood, however, that unless required by state law, Anheuser–Busch does not assign exclusive areas and does not grant exclusivity to Wholesaler in its primary market areas. (Def.Ex. AB–C) (emphasis added).

**11.** Heileman, Miller, Coors and Genesee all have adopted exclusive territories for distribution in New York State. The State has never challenged the exclusive territories of Coors and Genesee, and has settled all claims against Miller and Heileman *without* requiring them to

modify or refrain from enforcing their exclusive territorial agreements. In other words, the State does not claim that such agreements necessarily violate the antitrust laws.

**12.** These States are: Alabama, Arkansas, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Kansas, Kentucky, Maine, Maryland, Michigan, Missouri, Montana, Nebraska, New Hampshire, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, West Virginia, and Wyoming.

**13.** These States are: Arizona, California, Iowa, Louisiana, Minnesota, Nevada, New Mexico, Rhode Island, Virginia, and Washington.

dure to ensure orderly transition in management; (5) revised the procedures followed in event of a contemplated sale of an ownership interest in a wholesalership; and (6) revised the deficiency termination provisions.

### E. The Purpose of the 1982 Amendments

A–B's purported motive in imposing the 1982 amendments was to foster further wholesaler investment, increase distribution efficiency, enable wholesalers to compete more efficiently with rival brands, and to reduce free-riding by transshippers.[14] The amendments also sought to limit the amount of overage beer reaching the consumer. Although the defendant concedes that its wholesalers provided some services and made some investments called for in the previous Equity Agreements, the 1982 amendments *mandated* wholesaler investment. By entitling each wholesaler to an exclusive territory, A–B not only gave wholesalers the incentive to make the desired investments, but made them better able to afford such investments. (Tr. 2101, 2515, 2856–2857, 3122–3123). Not illogically, like any other business would, A–B says it hoped to increase their profitability by instituting methods to make them more competitive.

A–B, while conceding its opposition to the transshipping practice, does not concede that a desire to reduce transshipping motivated the implementation of the 1982 amendments. As was shown at trial, its opposition to transshipping stems from the negative effects transshipping had on both A–B's and A–B wholesalers' ability to provide the desired enhanced quality, services and promotions to consumers and retailers. (Tr. 2823–2824, 3407–3408; Pl.Ex. 38, at 168073–168076). Transshippers, having no allegiance to A–B, do not engage in the substantial investments and many of the quality control, product promotion and services that A–B asks of its wholesalers.[15] (Def.Ex. AB–AFT, Myslinski Report at 16; Pl.Ex. 38 at 168074).

Some of the proven detrimental effects of transshipping include:

1. *Free-riding:* Wholesaler efforts to increase demand for A–B products were undermined by transshippers who could reap the benefits of these efforts by selling A–B products in the wholesaler's territory. (Tr.

**14.** Paragraph 1 read:

1. Territory
(a) Anheuser–Busch and Wholesaler recognize and agree that it is essential to their mutual objectives under this Agreement that Wholesaler at all times maintain the financial and competitive capabilities necessary to achieve efficient and effective distribution of Anheuser–Busch Products in Wholesaler's sales area and to assure continued protection of the high quality and integrity of Anheuser–Busch Products. In order to:
 (i) enable Anheuser–Busch and Wholesaler to more effectively compete with the products of other brewers in Wholesaler's sales area;
 (ii) assure that the quality and integrity of Anheuser–Busch Products are constantly maintained recognizing that such Products are perishable, that it is vitally important that over-age Products no be permitted to reach consumers and that such Products must at all times be handled properly;
 (iii) induce and enable Wholesaler to make such investments in its operation and facilities as may be necessary or appropriate to maintain and enhance efficiency and effectiveness in Wholesaler's overall marketing efforts;
 (iv) induce and enable Wholesaler to engage in marketing, advertising and promotional efforts in Wholesaler's sales area, provide full customer services, achieve maximum representation of all Anheuser–Busch Products in all licensed accounts in Wholesaler's sales area and actively promote and aggressively market the full range of Anheuser–Busch Products which are the subject of this agreement;
 (v) assure that Wholesaler develops and maintains adequate and effective local community relation and exercises full responsibility to the community in its operations;
 (vi) foster, promote and maintain an efficient, viable and financially sound system of distribution of Anheuser–Busch Products to the benefit of Anheuser–Busch, its wholesalers and all purchasers of the Products; and
 (vii) facilitate and enable compliance by Wholesaler with the Operating, Sales and Merchandising Standards ...
(Def.Ex. A–A).

**15.** In fact, some home distributors, like State's witnesses Mr. Stella and Mr. Misciagna, will not allow A–B employees into their warehouses to inspect for overage beer. (Tr. 414–415, 1263–1265).

3406–3408; 3216; Pl.Ex. 38 at 168076; Def.Ex. AB–K, at 107182; Def.Ex. AB–D, Hausman Report at 5).

2. *Diminution of Wholesaler Efforts:* Transshipping put financial strains on wholesalers, diminishing their willingness to engage in advertizing and promotions or community affairs. (Def.Ex. AB–K at 107182; Pl. Ex. 38 at 168076; Pl.Ex. 265 at 12094).

3. *Diminution of Wholesaler Abilities:* Wholesalers became less able to afford the cost of inventory or forecast demand, often causing wholesalers to have too little or too much stock warehoused. (Tr. 2824; Pl.Ex. 265 at 129092, 129094).

4. *Quality Control:* Transshippers do not service the accounts they sell to, causing large quantities of A–B products to sit with retailers without a wholesaler to monitor the stock rotation and check freshness codes. (Tr. 2836–2837, 3216).

5. *Development of Existing and New Products:* Transshippers are not concerned with insuring shelf space for A–B products, or installing new "point-of-sale" materials, developing markets for lower volume brands or introducing new A–B brands.[16] This injures A–B's ability to compete with producers whose products are not transshipped to those accounts. (Tr. 3405; 3216; Pl.Ex. 38 at 1168073, 168076; Def.Ex. AB–D, Hausman Report at 12–14).

It is indisputable that transshipping was hampering A–B's ability to compete effectively in the *interbrand* market by reducing its ability to offer consumers and retailers the intended quality product and services. It was due to the above mentioned effects that A–B wholesalers became less effective in carrying out the duties A–B had assigned. It was A–B's stated intention through imposition of the 1982 amendments to improve further the performance of their wholesalers, and, in the process, some of the negative effects of transshipping would be reduced.

The State offered its own characterization of the motives behind the 1982 amendments. The State asserts that transshipping had a downward pull on A–B prices. (Plaintiff's Proposed Findings of Fact, at 16). This pull was "squeezing" the authorized wholesaler's profit margins. (Pl.Ex. 397, at 29–30; Pl.Ex. 265, at 129092). With the wholesalers forced to keep prices down, A–B's ability to raise the F.O.B.[17] prices was limited. The State views the 1982 amendments merely as mechanisms to reduce drastically transshipping's prominence and downward pull on prices, thereby enabling A–B and its wholesalers to raise prices and increase profits, while injuring both transshippers and the consumers.[18]

Exemplifying the alleged insincerity of A–B's stated purpose, the State vigorously disputed the defendant's portrayal of the amendments as a mechanism to eliminate the sale of any overage A–B beer. The indisputable fact, however, is that beer is a perishable product and like all perishable products it remains "fresh" for a limited

16. One way to establish new or smaller volume brands is through multiple package distribution, whereby the price of a lesser brand is discounted upon purchase of a major brand, like Budweiser. The harm done by transshipping to multiple brand sales in clearly exemplified in New York. In the Metropolitan area, where transshipping is most prominent, Budweiser accounts for 87% of the A–B products sold, whereas nationally Budweiser only accounts for approximately 53% of the A–B's sales. (Tr. 2060).

17. There are several different levels of beer prices. "Freight-on-board" ("FOB") price refers to the price a brewer charges its authorized wholesalers; "price-to-retailer" ("PTR") refers to

the frontline price a distributor chargers to a retailer or home distributor; "price-to-consumer" ("PTC") is what a retailer charges the consumer.

18. The State's case was severely hampered by a lack of expert economic testimony in their case-in-chief. Professor W. John Jordan was to be the State's only expert witness, but was not called because "his testimony would aid neither the Court nor the State." (Tr. 1542). The only expert economic testimony was that of rebuttal witness Professor Ralph Bradburd of Williams College, an economist with little previous exposure to the beer industry.

period of time. (Uncontested Facts ¶ 10). Although consumption of overage beer is not a health risk, the taste does vary from that of "fresh" beer and the older it gets the greater the variance. (Tr. 2077, 2448). Obviously, a producer, like A–B, has a distinct interest in offering the best tasting product possible by eliminating the (or at least ensuring a minimum) amount of overage beer that reaches the consumer. While its rebuttal expert, Prof. Bradburd, begrudgingly admitted the validity of this interest, (Tr. 3783), the State asserted that relatively few overage A–B products ever reach the consumer and, therefore, any act by A–B allegedly aimed towards remedying this "problem" is disingenuous. This assertion by the State is unconvincing for a number of reasons.

First, the data and testimony upon which the State bases this assertion does not accurately reflect the amount of overage beer reaching the consumer. Professor Bradburd's estimate that consumers had a 1 in 200 chance of purchasing overage A–B beer is clearly inaccurate.[19] Another basis for the State's assertion is the relatively low number of consumers who complained to distributors about purchasing overage beer. Here, too, the State makes an unsound assumption. Unlike a product such as milk, consumers can drink overage beer and not know that the product is overage but simply not enjoy the taste as they would a "fresh" beer.[20]

Even if the Court were to accept the 1 in 200 statistic offered by the State rebuttal witness Bradburd (which it does not), that data shows that thousands of cases of overage A–B beer were reaching the consumer each year. (Pl.Ex. 173). Every time a consumer, like Professor Bradburd, drinks an overage product, A–B risks losing that customer. (Tr. 3448, 3780–3781). The provisions of the 1982 amendments were clearly aimed at ensuring that only the highest quality product reached the consumer. (Def.Ex. AB–A ¶ 1, Tr. 2346, 3402). The risk of losing thousands of customers is certainly a bona fide interbrand justification for A–B's interest in undertaking some remedial action.[21]

Secondly, and most significantly, the 1982 amendments were designed to remedy this overage problem through provisions specifically aimed at the overage problem. These provisions, namely the "first-in, first-out", "come-to-rest" and the "CEW" requirement, were implemented not only in New York State, but all across the nation regardless of the existence of transshipping. (Tr. 2099). Had these provisions been aimed solely at transshipping it is highly unlikely they would have been implemented nationwide.

The "first-in, first-out" clause required wholesalers to ship out the oldest beer in the warehouse first. Proper stock rotation by the wholesaler was essential for compliance. (Tr. 3402–3403, 2098, 2287). The "come-to-rest" requirement prohibited wholesalers from shipping beer directly

---

**19.** The Professor arrived at this figure by using the dollar amount of credits paid by A–B to wholesalers for overage beer found during a 1983 A–B conducted "general sweep" of the New York Metropolitan area to calculate a total number of overage beers in the Metro area. (Pl.Ex. 173). Using this figure with the total A–B sales in the entire Metro area, the Professor produced the 1 in 200 ratio. This calculation assumes that (1) the 1983 "general sweep" visited all 20,311 accounts (unlikely in light of the fact that another "sweep" conducted in 1985, A–B visited only 3,953 of the 20,311 accounts existing in the Metro region [Pl.Ex. 102] ), and (2) that the "sweep" found every overage beer in the Metro region. The Professor admitted that if either of those two assumptions is faulty his figure that 1 in 200 cases are overage is erroneously low. (Tr. 3817–3818).

**20.** The unsoundness of the State's assertion was best exemplified by testimony of Professor Bradburd. The Professor testified that when stored long enough the taste of beer changes. He then testified that when he drank a beer whose taste he did not like, even though he was unsure whether the bad taste was because the beer was overage or because he simply did not like the taste of that brand, he (like any other consumer) would stop buying that product. (Tr. 3780–3781).

**21.** Even Professor Bradburd admitted that it is a legitimate business objective to take steps to ensure that overage beer does not reach customers.

from the brewery to a customer. Prior to the 1982 amendment, an A–B wholesaler was able to order beer and pick it up at the brewery and deliver it directly to a customer, many of whom were home distributors. This practice was eliminated by requiring the beer to "come to rest" at the wholesaler's warehouse before delivery. The practical effect of the "first-in, first-out" and "come-to-rest" clauses was to insure that beer was properly rotated in the warehouse and systematically diminished the likelihood that beer would be warehoused past, or close to, its freshness-expiration date. (Tr. 2095, 2098; Pl.Ex. 384, Farrell Dep. 324, 354).

The 1982 Agreement also required wholesalers to warehouse beer in controlled environment warehouses, or "CEWs". CEWs are temperature controlled and through elimination of temperature variances the shelf-life of beer is extended.[22] Although it was A–B's "objective" that wholesalers make substantial investment in building CEWs, it was not until 1982 that they were required. (Tr. 2105). In addition to the terms of the Agreement, A–B also implemented a wholesaler identification coding system by which it could be determined from which wholesaler a product originated. This system allowed A–B to monitor wholesaler compliance with stock rotation responsibility and the come-to-rest provision and additionally determine responsibility for any recovered overage beers.[23] (Pl.Ex. 64 at 575158).

In sum, even assuming, arguendo, A–B may have indirectly been motivated by an intention to reduce transshipping stemming from transshipping's harmful effects, the Court finds that its primary intention in imposing the 1982 amendments was to increase its interbrand competitive edge in the beer market by causing its wholesalers to distribute more effectively and efficiently and to reduce the likelihood of overage beer reaching the consumer.[24]

## F. The Effects of the 1982 Amendments

The 1982 amendments had two substantial effects on wholesalers; (1) areas of "primary responsibility" became exclusive territories, and (2) many earlier wholesaler "objectives" became required practices. In conducting a rule of reason analysis, the Court must ascertain not only the purpose underlying the restrictions, but inquire into their actual effects. Only then can the Court balance the harms and the benefits of the restraint.

### 1. Benefits of Exclusive Territories

Exclusive territories, although prominent in beer distribution, are not unique to the beer industry. Other industries, like soft drinks, telecommunications, magazines, newspapers, automobiles, clothes, and consumer electronics have implemented exclusive territories for distributing their product. (Uncontested Facts ¶ 77). Additionally, beer, owing to its perishable nature, requires proper handling and exclusive territories to promote efficient and effective handling of the product. Other perishable goods commonly utilize exclusive territories, such as soft drinks, ice cream and orange juice. (Uncontested Facts ¶ 77).

Focusing on A–B's territorial restrictions, one obvious benefit is the elimination of overlapping and redundant sales efforts by different authorized wholesalers. As

---

**22.** As a result of the CEW requirement, A–B was able to raise Budweiser's freshness period from 90 to 105 days. (Tr. 2015).

**23.** The wholesaler coding also assisted with determining if a wholesaler was servicing out-of-territory accounts to whom a wholesaler's product was sold, as required by A–B. The State argues that the wholesaler coding and the out-of-territory account servicing were aimed at further reducing transshipping. Not only did A–B offer valid business purposes for imposing such

requirements, namely protection of product quality, but that purpose was validated by one of the State's own witnesses, Peter Enzien, an A–B wholesaler who has continued transshipping to this day testified that it was "totally legitimate" for A–B to institute these policies to protect its product. (Tr. 1840–1841).

**24.** As will be discussed, infra, if A–B truly intended to eliminate transshipping it easily could have behaved as many of its competitors have and imposed "air tight" exclusive territories.

defendant's expert Hausman [25] testified, it is inefficient for a producer to have various sellers of its product competing for the same customers. (Tr. 3398–3399).

Through imposition of the exclusive territories A–B wholesalers were and are able to compete more effectively in the interbrand market. (Def.Ex. AB–D, Hausman Report at 6). Both Mr. Vukelic, Mr. Hunter and even the State's witness Mr. Enzien offered testimony that the exclusive territory provisions enabled A–B wholesalers to compete more effectively with other brands of beer.[26] (Tr. 2346, 2388–2389). In fact, Mr. Enzien, an A–B wholesaler for over 20 years, testified that exclusive territories were the best way to enable wholesalers to compete against other brewers, ensure the quality and integrity of A–B products, induce and enable wholesalers to invest, engage in marketing, advertising, promotions and community relations, provide customer services, and achieve maximum distribution of A–B products. (Tr. 1774–1777). The State rebuttal expert was unable to assert that wholesaler procompetitive activities did not increase due to the 1982 amendments. (Tr. 3756).

The defendant's position is reinforced by the increased market share achieved by A–B after implementation of the 1982 amendments. As Professor Hausman testified, increase in demand following imposition of a vertical restraint is evidence of the procompetitive effects of the restraint and the resulting increase in consumer preference for the product. (Tr. 3409–3410). From 1977 to 1982, A–B's market share increased an average of 1.65 percentage points annually. But in the two years subsequent to the 1982 amendments, A–B's market share increased, 1.8 and 2.1 percentage points, in 1983 and 1984, respectively. From 1984 to 1990, A–B's market share continued to increase, although at a slower pace. (Def.Ex. AB–WC). As a State witness Mr. Enzien testified, the increase in sales was caused by firm adherence to the standards set forth in the 1982 amendments. (Tr. 1760–1772). In short and in the vernacular, "the proof is in the pudding."

The amendments also were shown to succeed in their attempt to protect product quality. Since 1982, thirteen (13) CEW warehouses have been built in New York State. The "come-to-rest" and "first-in, first-out" provisions have been strictly adhered to. Mr. Parker testified that the amount of overage beer in his territory has been reduced as a result of the amendments. (Tr. 2839–2843). Professor Hausman also testified that CEWs, stock rotation and removal of overage beer from stock all contributed to further A–B's desire to increase quality. (Tr. 3402–3403).

The defendant also provided powerful evidence that the desired monetary investments have, in fact, been made by the wholesalers. All three of the authorized wholesaler witnesses made substantial investments in their facilities, spending hundreds of thousands of dollars on improvements that would not have been undertaken without the 1982 amendments. (Tr. 1761–1777, 2515, 2857–2875). Two of the wholesalers also made substantial investments in manpower, promotion, services and merchandizing activities.[27] (Tr. 2863–2867, 2876–2882). It was clear from this testimony that the investment A–B hoped to induce was taking place. Adherence to the standards of the 1982 agreement brought about higher wholesaler perfor-

**25.** Professor Jerry A. Hausman is a professor of economics at M.I.T. who has also studied the beer industry extensively.

**26.** Eugene Vukelic operates Try–It Distributors, an A–B authorized wholesaler in Buffalo; Frank Parker operates Sound Distributing, an A–B authorized wholesaler in the Bronx; Peter Enzien operates Boland Distributors, and A–B authorized wholesaler in Troy.

**27.** These increased activities include: hiring additional personnel, purchasing additional trucks, installing phones and computers, repairs and improvements of existing facilities and vehicles, uniforms, fork lifts, and community relations. Increased services brought on closer personal contact with customers, supplying point-of-sale materials, use of route books and monitoring product freshness. The extent to which enormous investments were essential to operating a successful wholesalership was vividly demonstrated during the Court's visit to the Clare Rose wholesalership.

mance.[28] There is no question but that the 1982 amendments resulted in numerous procompetitive actions by A–B's authorized wholesalers.

### 2. Anticompetitive Effects

The State alleged that the 1982 Equity Agreement had anticompetitive effects on both transshippers and consumers. Specifically, the State asserts that the provisions discussed above, when taken together resulted in injury to transshippers, which, in turn, injured the consumer by eliminating transshipping price reducing impact on the beer industry and resulted in higher beer prices.

#### (i). Effect on Transshipping

##### (1). Level of transshipping in 1982.

The State has alleged that in 1982, before the implementation of the Equity Agreement, 12 million cases of A–B beer were transshipped in the New York Metro region.[29] (Pl.Ex. 102, at 295514). Regardless of the accuracy of this figure, it is clear that transshipping was increasing in the years leading up to 1982. By A–B's own estimates, the percentage of A–B beer that had been transshipped in 1981 had increased to 30.1% from 5.4% in 1971.[30]

##### (2). Level of transshipping immediately after 1982.

Immediately after the implementation of the 1982 amendments the level of transshipped beer decreased. Vigorously contested was whether this reduction stemmed from one or more acts by A–B or from a general misinterpretation of the "indirect" sale prohibition clause. The evidence has shown that although A–B did not support transshipping, the 1982 amendments, as interpreted by A–B, did not prohibit sales to transshipping distributors. The amendments permitted authorized wholesalers to sell to home distributors located in their territory whom they knew sold outside the territory.

The State protested that by prohibiting "indirect" sales outside an authorized wholesaler's territory, A–B was prohibiting transactions to home distributors who would, in turn, sell outside the authorized wholesaler's territory. This assertion is contradicted by testimony of James Hunter, A–B Vice President of Sales, (Tr. 2037–2041), August A. Busch, III, Chairman and CEO of A–B (Pl.Ex. 378, Busch Dep. at 172–173), and numerous wholesalers.[31] In

---

**28.** The State argued that A–B wholesaler performance reports were not introduced to prove improved performance. Nevertheless, as discussed above, all three wholesalers who testified at trial stated that wholesaler performance improved after the amendments.

**29.** The State arrived at this figure solely by citing an estimate from a document created by A–B. Although the Court does not find the evidence supporting this figure entirely persuasive, the defendant was unable or unwilling to propose a counter figure. The Court will accept the 12 million case figure as the most likely level of transshipping in 1982.

**30.** The State offered very little evidence to support its claims regarding the level of transshipping. Professor Bradburd's testimony was introduced under the guise of rebutting the defendant's experts. Instead, State has attempted to use the Professor's testimony to establish affirmatively certain facts that should have been is introduced in their case-in-chief. Further, estimates taken from documents created by A–B employees, although somewhat persuasive, are merely estimates. (Pl.Ex. 102, 295514). The State's inability to offer more than testimony

from a few transshippers and a rebuttal witness is an unstable foundation upon which to build a case.

**31.** At his deposition, Mr. Jay Heimowitz of United Beverage testified to being told by A–B counsel that sales to transshippers who sell out-of-territory "would be fine." (Pl.Ex. 388, Heimowitz Dep. at 18, 76). Mr. Richard Monsees of Port Distributing, Mr. Joseph DeMarco of Rutgers Distributors, and Mr. Joseph Raso of Raso Beer Distributors all testified to understanding that the "indirect sales" clause permitted any in-territory sale, even to a transshipper. (Pl.Ex. 398, Monsees Dep. at 33; Pl.Ex. 381, DeMarco Dep. at 83; Pl.Ex. 401, Raso Dep. at 75–77). Mr. Peter Enzien of Boland Distributors testified that he feared being terminated if he did not cease all sales to transshipping home distributors, but was told by A–B counsel prior to the execution of the 1982 amendments that "if goods were transshipped from one market to another market by a legitimate purchaser within your own market, that would be—would not be ground for termination, as long as the sale was not a sham or frivolous." (Tr. at 1473). Nevertheless, Mr. Enzien ceased transshipping on January 1, 1983. (Tr. 1474). But, by the end

fact, A–B counsel, Royce Estes, confirmed in writing in October 1983 that legitimate sales to transshipping distributors were not grounds for termination. (Def.Ex. AB–R). Both that letter and repeated testimony state that it is, and always has been, A–B's interpretation of the "indirect" out of territory sales prohibition to encompass only those sales *solicited* by the wholesaler to out of territory customers, whose transaction is consummated through a "sham" third party. Legitimate sales to in-territory home distributors who ship out of territory were not shown to violate the terms of the amendments.

The State offered no evidence showing that A–B ever told a wholesaler that they were prohibited from selling to a known transshipper or that any wholesaler was terminated for selling to a known transshipper.[32] Instead, the State offered evidence that A–B opposed transshipping and that certain wholesalers independent interpretation was that the 1982 amendments proscribed sales to these transshippers and ceased such sales. In light of this evidence, or lack of evidence, the immediate drop in transshipping following the implementation of the amendments appears to be a direct result of distributor confusion.[33] Although, considering A–B's distaste for transshipping, A–B may be faulted for not having exerted itself to assure proper interpretation by the distributors, A–B convincingly showed their willingness to explain their interpretation of the "indirect sales" clause to inquiring wholesalers.

The evidence showed that for the years immediately after the amendments, trans-

shipping of A–B products was reduced. This was not predominantly a result of A–B policy, but rather confusion in the marketplace. Had the reduction been due to A–B policy, it is unlikely that by 1986 transshipping's prominent role in the distribution of A–B beer would have been so forcefully re-established as it has been presently.

### (3). The present level of transshipping.

It was uncontested at trial that, in 1990, 14,150,000 cases of A–B beer were transshipped in the New York Metro region. Rather than eliminate transshipping, as the State claims was intended, under the 1982 Equity Agreement millions of cases of beer continue to be transshipped every year. Using the State's proposed figure of 12 million cases transshipped in 1982, the Metro region transshipment volume increased by a total of 2,150,000 cases by 1990. In spite of exclusive territories, the total amount of transshipped beer was higher in 1990 than it had been before the 1982 amendments, although the percentage of beer that was of transshipped beer had fallen.[34]

Also evidencing the continued presence of transshipping has been the ability of distributors to obtain A–B beer from more than one wholesaler. If exclusive territories were "airtight", a home distributor would receive all A–B beer from one wholesaler. However, the State's own witnesses, owners of home distributorships, testified that they have continued purchasing A–B products from numerous transshipped

of 1983, Mr. Enzien's sales to transshippers revived and by 1990 he sold 5.2 million cases of A–B to transshipping seller, Thruway Beverage. (Def.Ex. AB–VR).

**32.** The only allegedly punitive acts by A–B were the withholding of certain products from wholesalers. Mr. Enzien of Boland testified that A–B stopped making 8 oz. cans of Budweiser available to him from 1982–1986. (Tr. 1720–1723). The 40 oz. bottles of Budweiser were never available to him or Kiamesha Lake wholesalers. Pl.Ex. 463. The State offered no proof that A–B withheld such products punitively or that A–B had an obligation to supply all its wholesalers with all of A–B's product line.

**33.** A second factor in the reduction of transshipping following the 1982 amendments was the fact that authorized A–B wholesalers, like Mr. Enzien, who had been participating in transshipping themselves, without use of a third party, no longer took part in the practice in that active capacity.

**34.** Calculations made by the State based on a document created by A–B employees estimates that beer transshipped from outside the Metro region accounted for 41% of total Metro A–B sales in 1982, but had dropped to 19% in 1983. (Pl.Ex. 102, at 295514). State's rebuttal witness Bradburd estimated that by 1986 that figure had risen to 29%, and to 33% in 1990. (Pl.Ex. 628).

sources.[35] (Tr. 386–395, 971). The numbers and testimony only serve to disintegrate further the State's suggestion that transshipping was "eliminated" or even "significantly reduced". (Tr. 36).

The State called four home distributor-transshippers as witnesses.[36] Three of the four of these witnesses have continued to transship since 1982.[37] These witnesses testified that they engaged in many practices to achieve a competitive advantage over the authorized wholesalers. These practices included: carrying brands from numerous brewers; offering prompt deliveries; remaining open on weekends; mixing and matching quantity discounts; and picking-up all brands of empty containers. (Tr. 139, 142–143, 756–758, 1160–1161). None of these methods of competition were restrained by the 1982 Agreement, as is evidenced by these distributors' continued profitability.[38] Mr. Misciagna has continued transshipping at approximately the same pre–1982 amendment level, with 99% of his stock transshipped. He also testified that while competition in transshipping A–B products was "extremely competitive" in 1980–1982, the competition was still "intense" in 1986–1990. (Tr. 1125–1126).

Clearly, under this system territories were not airtight; products originally sold by an authorized wholesaler could end up outside that wholesaler territory through transshipping. If A–B's sole intention behind the exclusive territories was to eliminate transshipping, it very easily could have effected such a result, as have other brewers (e.g., Miller, Coors), by imposing airtight exclusive territories. A–B's decision not to create airtight territories further supports its assertion that harming transshippers was not the motive behind the amendments.[39]

In sum, the State successfully showed that transshipping was reduced in the years immediately following their implementation of the 1982 Equity Agreement. The State, however, failed to prove that this reduction was a direct result of A–B's actions and did not stem from a general misunderstanding or misinterpretation of the terms of the Equity Agreement by a number of wholesalers. However, A–B may be faulted for not affirmatively acting to clear up any misunderstanding over its exclusive territory policy. As a result, those involved in transshipping may have been briefly injured, although this injury may have been the result of their own inaction.

(ii). Effect on Price

Central to the State's case is the notion that transshipping exerted downward pressure on A–B beer prices which resulted in savings to the consumer and that the 1982 amendments by diminishing transshipping reduced the effectiveness of this downward pressure. By limiting transshipping and its effect on prices, the State claims A–B

**35.** The one State's home distributor witness who relied on a singular supplier for A–B products, Nicholas Misciagna, has had just the one supplier since 1978, four years before the implementation of the amendments in question.

**36.** These witnesses, Carmine Stella, Robert Vlasaty. Steve Rosenthal and Nicholas Misciagna, are all home distributors who have opposed the 1982 amendments since its inception. Each is a member of the both the Empire State Beer Distributors Association and the Independent Beverage Distributors Alliance. Both groups that have vigorously opposed the A–B and the 1982 amendments, in fact, the sole purpose of the "Alliance" is to "coordinate and manage.... anticipated litigation against A–B". (Tr. 336–337).

**37.** Mr. Vlasaty of Vasilow Distributors decided to close his business a couple of weeks before the Equity Agreement became effective, after his authorized wholesaler, Raso Beer Distributors, informed that he could no longer sell to Vasilow due to the new Equity Agreement. Mr. Vlasaty, never submitted an order that was turned down and had he inquired prior to terminating his business, he may have learned that Raso was permitted to sell to him under the Equity Agreement.

**38.** Messrs. Stella, Rosenthal and Misciagna all testified to the prosperity of their businesses after the 1982 amendments. (Tr. 141, 367–370, 942–944, 1184–1185, 1218–1219). Mr. Vlasaty decided to close his distributorship before the effective date of the 1982 amendments. (Tr. 697–698).

**39.** Even if that was A–B's purpose, due to the free-riding of the home distributor transshippers on the efforts of A–B and the authorized wholesalers, that purpose would not necessarily be an illegal one.

was able to increase the F.O.B. price and require costly distribution methods and wholesalers were able to increase their profit margins. The alleged result was injury to transshippers and consumers through increased beer prices.[40]

Although proof of this price increase theory was essential to its case, the State offered no evidence of actual increased prices paid by consumers. (Tr. 3684–3688). The State attempted to prove increased consumer prices by relying on disjointed evidence of A–B's F.O.B. prices, frontline prices and testimony of home distributors. Yet, there was no direct proof of how the consumers were effected by these increases of the early 1980s. It is clear that presently consumer prices are falling in the New York Metro area. (Tr. 1496). Between 1987 and the end of 1990, the actual prices paid by consumers of A–B products actually decreased by 12% relative to the Consumer Price Index. (Def.Ex. AB–AGD; Tr. 3423–3427). In sum, while the Court can accept the assertion that consumers felt some impact of the price increases in the early 1980s, the lack of direct evidence makes a finding on the extent of that impact impossible.

Instead of proof of consumer prices, the State insisted throughout the trial and based its claim of increased prices on data pertaining to frontline prices, the "sticker" price of beer when sold from wholesaler to retailer. However, the evidence showed, including the testimony of State's own witnesses, that A–B beer was rarely sold to retailers at the frontline price, and subsequently, the price to retailers was rarely reflective of the frontline price.[41] Most sales, anywhere from 90% to 100%, to re-

tailers were discounted.[42] Consequently, for frontline prices to be reliable tools for analyzing actual transaction prices the State had to show that increases in the price after discount to retailers corresponded to increases in the frontline price. The State offered no credible evidence to support such a finding, (one witness, Mr. Enzien, testified as such, but later contradicted that very statement.) (Tr. 1724–1727, 1738–1741). Without such a showing, the Court fails to see how frontline prices can be a relevant tool for analysis.[43] (Tr. 3221–3222).

Regardless of this serious flaw in the State's case, the State has shown that the F.O.B. price charged by A–B and paid by home distributors for A–B products has increased since 1982 and the implementation of the amendments. A–B has never disputed that the price of their products has risen since 1982 when the Equity Agreement became effective. A–B increased its F.O.B. prices in September 1983 by 45 cents. (Uncontested Facts ¶ 117, Def.Ex. AB–L). Corresponding to these increases, the State showed that the frontline price to home distributors of 12 ounce cans of Budweiser increased substantially from November 1982 to September 1983. Data from five home distributors shows an average increase of $1.66 over those 10 months.[44] (Tr. 314–316, 854–855, 1191–1194). However, over the next three years, prices dropped. For instance, Rutgers Distributors, whose price per case increased from $7.20 per case to $8.75 per case in ten months, had decreased to $7.80 per case by July 1986. (Def.Ex. AB–ADT). The State proved a substantial increase in the A–B

**40.** The Court finds it ironic that to support its case based on a contention that the 1982 Agreement injured transshippers the State called as witnesses home distributors who have prospered since the introduction of the Agreement.

**41.** State's witnesses Mr. Rosenthal and Mr. Misciagna rarely ever bought A–B products at the frontline price, and Mr. Enzien testified that only 1% of his sales were made at frontline prices. (Tr. 1026–1027, 1262, 1883–1885).

**42.** Mr. Parker testified that all of his sales were made at a discount, while Mr. Hunter stated

that 90% of all sales in the State of A–B beer were made at other than the frontline price. (Tr. 2815–2816, 2124).

**43.** Assuming frontline prices were the appropriate measuring tool, the State still failed to show that such an increase was causally related to the allegedly illegal terms in the 1982 equity agreement and not the other factors listed, infra.

**44.** The impact of this evidence is tempered by the fact that it is based upon the testimony of only four home distributors, out of the approximately 500 in the State.

**864**

frontline prices from 1982 to 1983,[45] but also showed a subsequent decrease in price leading into 1986. After 1986, the F.O.B. price of A–B beer rose at an insubstantial pace. While the State has shown some increase in price after 1986, that increase has been at a rate lower than the Producer Price Index (an index the State's rebuttal witness Bradburd admitted is most pertinent to beer pricing). In fact, since 1982 A–B price increases have been lower than the rate of inflation. (Tr. 3420–3422). In sum, the State has proven a substantial rise in the price for A–B products from 1982 through 1983. Since that period, while prices have continued to increase, it has been at a much slower pace.

The State failed to establish a clear causal relationship between any increases in price and the reduction in transhipping caused by the 1982 Equity Agreement. The State adequately proved that transshipping exerted a downward pressure on the price of A–B beer to the retailers. The State failed to show, however, that these savings were passed on to the consumer. Indeed, in many cases, any price reduction caused by transshipping benefitted only the retailer and not the consumer: the lower price paid by the retailer went into increasing his profit margin without any net advantage to the consumer. (Pl.Ex. 38, at 168072). The State also claims that the reduction in transshipping allowed A–B to increase excessively its F.O.B. prices. Had a reduction in transshipping caused such an increase, it is unlikely that A–B's F.O.B. prices in New Jersey, a State without transshipping, would have increased at a same rate as those in Metropolitan New York. (Def.Ex. AB–WI; AB–AFT, Myslinski Report at 53–55). Thus, the State has failed to prove that a reduction in transshipping caused F.O.B. price increases or caused increases in consumer prices.

Further, the State alleges that both wholesalers and home distributors were able to increase excessively their profit margins due to the decreases in transshipping. To support this contention the State showed that certain authorized wholesalers [46] and home distributors increased their profits in the years after the 1982 amendments.[47] (Pl.Ex. 25; Tr. 1185–1187, 1482–1486, 1495–1496). While profit margins increased through 1983, the evidence produced by the State failed to show a pattern of increasing profit margins after 1983 and tended to show a decrease in the margins in most recent years. (Tr. 1492–1496, 2384, 2418, 2792). The State asserts these periodic increases in wholesaler profit margins are a result of anticompetitive effects of the 1982 Equity Agreement and not due to an increasingly efficient and effective business. Merely increasing profits does not violate the antitrust laws, and, in light of the intensely competitive state of the beer market, the Court finds it unlikely that wholesalers and home distributors could have "excessively" increased their profit margins.

The State also claims that a number of costly practices required by the 1982 Equity Agreement directly effected the cost of A–B beer. Two of these practices are the "come-to-rest" and "first-in, first-out" provisions, which the State claims increased the handling costs of A–B beer. Mr. Enzien, an A–B authorized wholesaler, testified that the "come-to-rest" requirement added eight to twelve cents to the per-case freight charge. (Tr. 1535). While it is not unlikely that such cost would increase the price a distributor pays, there was no other evidence submitted to support this figure. Indeed, even if we accept the validity of the 8–12 cents added cost, the State did not

45. Part of this increase was due not to an price increase by A–B, but rather to home distributors changing wholesale suppliers. Those home distributors who purchased beer directly from a transshipping authorized wholesaler were forced to find a new supplier after the 1982 Agreement. When these distributors changed wholesaler, the price they paid was sometimes higher. (Tr. 794–796, 807–808, 886; 293–296).

46. Of the thirty-four authorized wholesalers in New York, the State relied on the financial statements of only five.

47. It is unclear what role the Deposit Law had in these increased profit margins. *See* infra.

prove that such a cost was passed onto the consumer.[48]

While the effect of the "come-to-rest" and "first-in, first-out" provisions on prices is uncertain, it is clear that prices were influenced by the three factors unrelated to the Equity Agreement: (1) the so-called "Deposit Law"; (2) inflation and increased costs; and (3) increased capital and promotional expenditures. The role played by these factors further weaken the State's assertion that the Equity Agreement caused unreasonable increases in prices.

The New York State Returnable Beverage Container Law, better known as the "bottle bill" or "Deposit Law", became effective on September 12, 1983. *See* Envtl.Conserv.Law §§ 27–1001–1017.[49] It is uncontested that the law added $1.56 per-case to the price paid by the consumer.[50] (Uncontested Facts ¶ 136). The parties contest what the cost of compliance was for the wholesalers and distributors, and if the wholesalers and distributors profited from the law.

The Deposit Law caused authorized wholesalers to incur considerable expenses in construction of recycling facilities, and in additional personnel, storage area, and transport vehicles. This was an expensive undertaking, adding substantial costs on both authorized wholesalers and home distributors. In some cases, the cost of compliance was as high as $1 million. (Tr. 1016, 2774, 2912–2913; Pl.Ex. 381, DeMarco Dep. 268–269; Def.Ex. AB–ZL, Phillips Dep. 27, 35–36). The parties offered conflicting evidence of whether these substantial costs outweighed the additional income the Deposit Law provided. Most persuasive was evidence that the price to retailers of A–B beer in both Massachusetts and Delaware, States whose own deposit law was implemented in January 1983 and November 1982, respectively, increased more than in New York upon implementation of the Equity Agreement. Neither Massachusetts nor Delaware had transshipping as part of its distribution system. As Professor Hausman testified, considering that the price increases in Delaware and Massachusetts were greater than in New York, it is likely that price increase felt in New York was a result of the Deposit Law and not the Equity Agreement.[51] (Tr. 3428–3434).

Other elements which augmented the increase in prices were increases in costs and investments. The State alleges that F.O.B. price increases are not justified by the increased costs of doing business. The State asserts that, especially with the addition of the Baldwinsville brewery,[52] A–B beer production costs should have fallen along with

---

**48.** Lacking such proof, it does not necessarily follow that consumers would in fact incur this expense. One way home distributors remain competitive is by pricing themselves at or below the price offered by an authorized wholesaler. Thus, it is possible that the increased cost could have merely taken a portion of the home distributor's profit margin rather than have been passed onto the consumer. (Tr. 1116). Nevertheless, there was testimony that such a cost would be passed on to the consumers. (Tr. 817).

**49.** The Deposit Law required distributors to charge 5 cents or more on each container sold. The consumer is charged 5 cents upon purchase but is also entitled to the 5 cents upon return of the empty container to any seller of that product. The authorized wholesalers must pay the redeemer of the empty container the 5 cents for each returned container, plus a 1.5 cent per-beer handling fee (totalling $1.56 in compliance cost added to each case of beer).

**50.** Another factor which indisputably increased consumer prices was the rise in beer taxes between 1982 and 1990. In the 1982–1990 period,

the federal excise tax on beer increased from $.6532 per case equivalent ("C/E") to $1.3064 per C/E. The New York State excise tax increased $.373 per case from 1982 to 1990. The New York City excise tax has remained unchanged at $.27 per C/E. In total, in 1982 a case of A–B beer was taxed $1.0232, while by 1990 this tax was up to $2.0494.

**51.** A–B waited until the advent of the bottle bill to invoke a substantial F.O.B. price increase. (Tr. 1274; Def.Ex. AB–L at 38071–38074). The State argues that A–B's purpose behind the delay was to enable themselves to blame the bottle bill for the entire price increase, while A–B offers the business rationale of not desiring to raise prices twice in one year. In light of the above evidence, the State did not adequately show that the Deposit Law was not responsible for a large proportion the 1983 price increase or that the Defendant's suggested purpose was illusory.

**52.** The direct cost of brewing Budweiser is lower in Baldwinsville than in Newark.

F.O.B. prices. Instead, F.O.B. prices rose to what the State considers an excessively high level.[53]

It is natural that inflationary pressure was responsible for some increase in A–B's direct costs, such as salaries, energy and transportation. (Pl.Ex. 378, Busch Dep. 204–210). As a result, the cost of operating a wholesalership has increased since 1982. (Def.Ex. AB–YE; Tr. 889–890, 1259–1260). Adding to that increase are the numerous capital expenditures made by A–B in the early 1980s, totalling $278 million, (Tr. 2331–2332, 2350; Def.Ex. AB–EN), as well as the expenditures related to an increased focus on advertising.

These factors certainly added to the price of A–B beer. The cumulative effect of these factors diminish the portion of any price increase that could be attributed to the 1982 Equity Agreement. Thus, in spite of the State's allegations, the bulk of the evidence shows that A–B's F.O.B. prices increases were reasonable and at a rate lower than inflation since the 1982 amendments. (Tr. 3420–3422). Had the price of beer increased unreasonably, A–B's sales should have gone down. Instead, sales increased during the post-amendment period. The State argues that due to A–B's price leadership, stemming from alleged market power, A–B was able to raise prices and other brewers followed, resulting in no loss of market share. But the State may not merely repeat the words "price leadership" and expect the Court to accept that characterization. There was no expert testimony that A–B was a price leader.[54] In fact, the nature of the beer market makes that assertion highly unlikely. Testimony, some from the States own witnesses [55], conclusively established the price sensitivity of the beer market, making it unlikely that A–

B could have unreasonably caused prices to rise and simultaneously increased their market share.

At best, the State has shown an increase in F.O.B. prices from November 1982 to the end of 1983. To some extent these increases were the result of the 1982 amendments. For a substantial portion of those increases, however, the State has not carried its burden of showing that the price increases were causally related to the Equity Agreement.

G. Relevant Market

In an antitrust action the court shall discern of what the relevant product and geographic markets are comprised. The parties stipulated that relevant product market for this case is all beer: alcoholic and non-alcoholic; premium and super premium; imports and domestics. (Uncontested Facts ¶ 131). Not only have the parties stipulated to this fact, but the evidence clearly reinforced this designation.

Numerous witness testified concerning the price sensitivity of beer and consumer willingness to alter their purchasing patterns for lower priced beer, creating an atmosphere of intense competition between producers. (Tr. 1611–1613, 2129–2130, 2327, 2378–2379, 3363–3364). One State's witness testified that Budweiser is more price sensitive today than before the 1982 Equity Agreement. (Tr. 1613). Professor Hausman testified that if A–B raised its prices 10 percent, it would lose from 40% to 60% of its sales. (Tr. 3366–3374). This price competition exists among all brands of beer. For instance, one retailer testified that when an imported beer, Molson, dropped its price its increased sales cut into both Budweiser's and Michelob's sales. (Tr. 1611–1612).[56] Price competition is so

---

**53.** This assertion is supported by a showing that from 1982–1986 the FOB prices of all A–B products in New York exceeded their average variable costs.

**54.** Professor Bradburd stated his belief that A–B was a price leader. As a rebuttal expert, however, his testimony is technically not offered to assist the State's case-in-chief.

**55.** Mr. Misciagna of MHS Distributors testified that beer was extremely price sensitive and a rise in prices of one dollar per case would result in an extreme loss in sales. Mr. Dunn of Stewart Stores testified not only of the inverse relationship between Budweiser prices and sales, but also that Budweiser is more price sensitive today than it was before the 1982 amendments.

**56.** The witness, Mr. Dunn of Stewart Stores gave credible testimony in reference to the effect of

keen, the State's own witnesses testified, that competition is presently more vigorous than it had been 10 or 15 years ago. (Tr. 2129, 2377, 2428, 2129, 2813). Aside from price, display of the product is another important factor in propagating beer sales. (Tr. 2379–2380). Display of point of sale materials can generate up to a 250 percent increase in sales at a particular retail operation. (Tr. 2379–2380). When taken together, these factors exhibit a willingness of consumers to substitute one beer product for another. Consistent with this highly sensitive market, the parties concurred that the relevant product market in this case is all brands of beer.

The parties are not in agreement as to what the boundaries of the relevant geographic market are.[57] While the State presently claims that the appropriate market boundary is the State of New York, it is apparent that the State has not proven this market boundary. Indeed, the State has found it unexplainably difficult to promote consistently a single theory concerning the applicable relevant boundary, repeatedly straying from its original conception of a state-wide beer market.[58] The contradictory theories have made the Court's job of defining the market more burdensome than usual. But, notwithstanding the shifting market theories of the State, the evidence has clearly proven that the New York State is not a relevant

market unto itself, and that there are at least three, possibly four or more distinct relevant geographic markets.[59] Distinct markets may exist in the Metropolitan area, the Buffalo area, the northeast region, and a central region encompassing Rochester, Syracuse and Oswego.

A number of factors conclusively proved the existence of these markets. First, home distributors are concentrated in Metropolitan New York City; about 70% of the 500 in the State are in Metro New York. In many regions of the State, Plattsburgh and Rochester, for example, home distributors have an insignificant (if any) presence. As one of the defense's expert witnesses, Professor Hausman, testified, the presence of a competitive factor, such as home distributors in one region contrasted with the absence of that competitive factor in other regions, evidences separate markets. (Tr. 3359–3360).

Likewise, home distributors in the Metropolitan area do not directly compete with the few home distributors located in the northern and western portions of the State, areas like Albany, Buffalo, Syracuse, Rochester or Plattsburgh. (Tr. 2819–2820). Although evidence was introduced at trial showing that some transshipping occurs between the Metropolitan area and the rest of the State, such minimal product interaction is insufficient to synthesize the regions into a single marketplace.[60] Even if some

---

prices upon beer sold out of Stewart Stores. His testimony regarding the distribution of A–B beer, however, is entirely discounted by the Court due to his lack of knowledge of the usual distribution process in New York State. Stewart Stores are unique participants in the beer market, rendering Mr. Dunn's experiences in variance with all other market participants.

**57.** The State has asserted throughout the trial that establishing a relevant geographic market is unnecessary for this case. All of the State's claims regarding relevant geographic market discussed, *supra,* were made in the alternative to this assertion. The Court's ruling regarding this assertion is discussed, *infra.*

**58.** For instance, the State proposed a statewide market up until the first day of trial when counsel drew a line between Oswego and Binghamton, and stated that the region east of that line was the relevant market.

**59.** Dr. Myslinski's stated, "it seems to me we could divide the A–B wholesalers in New York into two groups. I call them upstate and downstate" (Tr. 3131); and that "the record is clear that the State is not one large market. That is a pretty clear-cut conclusion." (Tr. 3077). Dr. Hausman testified that "... there was not one relevant· geographic market, and in fact, there were numerous geographic markets" (Tr. 3307–3308, 3316), and "my conclusion as I sit here today is that there are at least the four relevant markets." (Tr. 3351–3354).

**60.** The State argued that transshipping was occurring "all over the State," (Tr. 133–134), but the bulk of the evidence revealed otherwise. Although isolated instances of transshipping outside of the Metropolitan area could be pointed to, the great majority of evidence put on by the State itself centered on transshipping in the Metropolitan area. Evidence of a few minor instances of non-Metropolitan area transshipping and unsubstantiated opinion testimony

business between the different regions takes place, the relevant market is determined by the area where the vast bulk of business occurs not the by the area containing fringe or possible customers. Secondly, it is uncontested that there is a stark discrepancy in the operating costs between businesses in Metropolitan New York and other areas within the State. As Professor Hausman pointed out at trial, these cost differentials in necessities, such as transportation and storage, tend to exhibit the existence of separate markets. (Tr. 3357–3358).

Finally, as was discussed, *supra*, consumer demand for different brands and types of beers varies widely within the State, as do the shares of sales for brewers and brands differ significantly across the State. For example, Genesee, Old Milwaukee and some Canadian imports are powerful market participants in the Buffalo area, but have a minimal presence in Metropolitan New York and Long Island.[61] While in the Metropolitan area Coors and imports such as Heineken, Becks and St. Pauli Girl have a substantially larger presence than they do in Buffalo.

The Court does not make a specific finding as to how many separate markets exist in New York State, but it is clear that there is more than one and the State has not proven the existence of any distinct geographic market. This failure is attributable, in part, to the State's "shifting sands" approach to proving a relevant market. Since the vast majority of State's witnesses and evidence emanate from the Metropolitan region, at best the State alternatively showed the Court that the Metropolitan region is a distinct market. It is clear that the State did not prove the geographic market it promoted initially and again at the end of the trial most often, i.e. New York State.

## IV. DISCUSSION

Section 1 of the Sherman Act prohibits "every contract, combination ..., or con-spiracy, in restraint of trade or commerce." 15 U.S.C. § 1. To prevail in a section 1 cause of action, the plaintiff has the burden of proving: (1) a concerted activity; (2) which unreasonably restrains trade. *See, e.g., Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 78 (2d Cir.1980); *Disenos Artisticos E Industriales, S.A. v. Work*, 676 F.Supp. 1254, 1275 (E.D.N.Y.1987).

### A. Hearsay Testimony

■ During the trial, certain hearsay testimony concerning statements made by A–B wholesalers was conditionally admitted, subject to proof by the State that such statements fell within the coconspirator hearsay exception of the Federal Rules of Evidence 801(d)(2)(E). To fall within the 801(d)(2)(E) exception, the proponent of the hearsay testimony must show that (1) there was a conspiracy; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; and (3) the statements were made in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987); *United States v. Maldonado–Rivera*, 922 F.2d 934, 958 (2d Cir.1990).

To satisfy the first element of the exception the State must prove a conspiracy or agreement by which the wholesalers and A–B were "knowingly d[oing] an act which the law forbids, purposely intending to violate the law." *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1196 (2d Cir.1989). "Knowingly" acting requires specific intent, while knowledge of unlawful objectives can be satisfied by specific intent or conscious avoidance. *Id.* Although the wholesalers and A–B knowingly entered into an agreement, the State never offered proof showing that the wholesalers and A–B entered into such agreement with an intent to violate the law, or "consciously avoided" such knowledge. Thus, the existence of a conspiracy was never proven. Without such a conspiracy, the statements

---

was insufficient to lead this Court into believing that transshipping was active throughout the State.

**61.** In Metropolitan New York, Genesee has a .21% market share; in Buffalo that share increases to 13.6%.

offered could not be "in furtherance of a conspiracy." Therefore, testimony offered concerning hearsay statements by A–B wholesalers is inadmissible hearsay.[62]

### B. Bradburd Report

■ A–B moved to exclude both the testimony and rebuttal expert report of State's rebuttal witness Professor Bradburd due to certain statements made by the Professor evidencing that portions of the Professor's report were actually written and edited by State's attorney, Timothy Cone. In spite of these statements tending to show a collaborative effort, we will not exclude any of the report (Pl.Ex. 628) or testimony offered by the Professor. Nevertheless, that testimony, along with the Professor's lack of previous experience with the beer industry, occasional inconsistencies, failure to consider certain important factors in his analysis, such as the Deposit Law, and Coors entry into the market and his use of frontline prices for his analysis instead of consumer prices, seriously damaged his credibility and further diminished the weight the Court gave his testimony.

### C. Concerted Activity

■ In a civil action, in order to sustain a claim under section 1 of the Sherman Act, the plaintiff must establish that the defendant entered into a contract, combination or conspiracy. *International Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793 (2d Cir.1987). The alleged illegal conduct in this case is the Equity Agreement entered into between A–B and its authorized wholesalers. It is axiomatic that such a contract will satisfy the first requirement of an antitrust action.

### D. Reasonableness

■ Since "restraint" is the very essence of every contract, the broad prohibition in section 1 against all restraints of trade has been interpreted to apply only to those agreements which "unreasonably" restrain competition. *National Soc. of Professional Engineers v. United States*, 435 U.S. 679, 687–688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Unless the conduct has a "pernicious effect on competition and lacks any redeeming value", the analysis will be governed by the so called "rule of reason." *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Northern Pacific Rail Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). This "rule of reason" requires the Court to weigh all the circumstances of the restraint in deciding whether or not a restriction imposes an unreasonable restraint on competition. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).

■ Exclusive territory agreements are known as non-price vertical restraints. Non-price vertical restraints are not presumptively anticompetitive, and must be analyzed under the rule of reason. *Sylvania*, 433 U.S. at 57–58, 97 S.Ct. at 2561–62. In overturning *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), and its per se rule, *Sylvania* firmly established the canon that all non-price vertical restraints, due to their potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition, must be analyzed under the balancing test of the rule of reason. *Sylvania*, 433 U.S. at 57–59, 97 S.Ct. at 2561–62; *Eiberger v. Sony Corp. of America*, 622 F.2d 1068, 1075 (2d Cir. 1980).

The State claims that it was unnecessary to establish as a prerequisite to proving a vertical non-price restraint unreasonable: (1) the relevant market, and (2) the defendant's possession of market power. This assertion is based on a lack of explicit

---

**62.** We note that the statements offered, even if admissible, would not have effected the Court's decision. The State claims that the statements confirm its allegations that the 1982 Equity Agreement forbade sales to transshippers. The statements in question may confirm A–B's sug-

gestion that there was confusion by wholesalers concerning the "indirect sales" clause, but add little to support the theory that A–B prohibited sales to transshippers, who in turn sold the products out-of-territory.

instructions regarding these factors in *Sylvania,* the predominant non-price vertical restraint case and that case's recognition that a court must weigh "all the circumstances."

### 1. *Relevant Market*

■ In spite of the State's arguments,[63] it has been repeatedly held that the first issue in any rule of reason analysis is to define the relevant market.[64] *Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n,* 641 F.Supp. 1179, 1189 (S.D.N.Y.1986); *See Disenos Artisticos E Industriales, S.A. v. Work,* 676 F.Supp. 1254, 1283 (E.D.N.Y.1987) ("the threshold issue in any rule of reason analysis, therefore, is the appropriate definition of the relevant market"); *Hayden Publishing Co., Inc. v. Cox Broadcasting Corp.,* 730

F.2d 64, 70 (2nd Cir.1984) ("a determination as to the boundaries of the relevant market is essential in order to measure the anticompetitive effect, if any, of defendants action...."); *Kaplan v. Burroughs Corp.,* 611 F.2d 286, 291 (9th Cir.1979), cert. denied 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980) ("proof that the defendant's activities had an impact upon competition in the relevant market is an absolutely essential element of the rule of reason case"). Only by taking this first defining step can a framework be built for the Court's analysis to operate within. It is clear that, proof of the boundaries within which the alleged harm has occurred is crucial for the State in proving its case.[65]

■ Finding that it is critical for the State to prove a relevant market, the Court holds that the State failed at this task.

---

**63.** Plaintiff also offered *F.T.C. v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), in support of its contention. In *Indiana,* a horizontal restraint case, the Supreme Court did not undertake an in-depth analysis of the market boundaries and any resulting market power, "since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as reduction of output, can obviate the need for an inquiry into market power, which is but a 'surrogate' for detrimental effects." *Id.* at 460–461, 106 S.Ct. at 2019. In short, *Indiana* holds that if the alleged horizontal restraint involves a naked restraint or patently offensive conduct which is clearly anticompetitive, inquiry into the market definition is unnecessary.

Unlike the scenario in *Indiana,* where the defendant did not offer any credible evidence of the horizontal restraint's pro-competitive nature, A–B has shown numerous credible procompetitive benefits gained from their vertically imposed policy. In fact, the Supreme Court in *Sylvania* by recognizing the benefits that often accompany vertically imposed restraints, in essence established that the inherent nature of the vertical restraint will rarely permit it to be so patently anticompetitive. The strong language in *Sylvania* recognizing the benefits of vertical territorial restrictions clearly indicates that it would be rare that the endorser of a vertical restraint would be unable to show some valid procompetitive benefits. Thus, unlike the horizontal restraint in question in *Indiana,* most vertical restraints will not be so manifestly anticompetitive that they can be found illegal without inquiry into the market definition. Possibly, only a vertical case similar to *Eiberger,* where no credible competitive benefits of the

policy were shown, could the requirement of in-depth market analysis in a vertical non-price restraint case be unnecessary.

**64.** While *Sylvania* did not explicitly require proof of market definition, the Court not only began its decision with recognition of the relevant geographic and product markets. 433 U.S. at 38, 97 S.Ct. at 2551, but also stated that "antitrust policy divorced from market considerations would lack any objective benchmarks." *Id.* at 53 n. 21, 97 S.Ct. at 2559 n. 21.

**65.** The State's claim that proof of a relevant market is unnecessary belies the practical application of the rule of reason. The rule of reason requires the balancing of anticompetitive harms against the procompetitive benefits. In different geographic markets a restraint will have different effects. For example, in the present case, transshipping was abundant in the New York Metropolitan area but scarce in the rest of New York State. The State's case is based on the allegedly anticompetitive effect the 1982 Equity Agreement had on transshipping. Clearly, due to the starkly disparate levels of transshipping across the State, the 1982 Equity Agreement effects on the beer market must have been starkly disparate in different regions of the State. (Def.Ex. AB–AFT, Myslinski Report at 65, 68). Proof of a relevant market enables the Court's analysis to maintain a coherent structure. Without such proof the reasonableness of the restraint will fluctuate as the anticompetitive effects and procompetitive benefits vary throughout the State. The result of the plaintiff's assertion would be the imposition of the Court's ruling on a region where the restraint may have been perfectly reasonable because of an unreasonable finding in another region.

Every relevant market is comprised of two components; the product market and geographic market in which the defendant's product competes. *Standard Oil Co. v. United States*, 221 U.S. at 61, 31 S.Ct. at 516. A product market is "composed of products that have reasonable interchangeability for the purpose for which they are produced." *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956); *Hayden Pub. Co., Inc. v. Cox Broadcasting Corp.*, 730 F.2d at 70–71 (the concept of high cross elasticity of demand and willingness of purchasers to substitute one product for the other are signs of a cohesive product market). The product market in this matter is all beer. This factor has not only been stipulated to by the parties but was demonstrated by evidence of the large and significant cross elasticities among all types of beer.

 In the alternative to its position that geographic market is irrelevant, the State has proposed that the geographic market is New York State. The relevant geographic market is determined by the area where the vast bulk of business occurs and not by the area containing fringe or possible customers. *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 359–361, 83 S.Ct. 1715, 1739–40, 10 L.Ed.2d 915 (1963); *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814 (2d Cir.1979) ("the geographic market must correspond to commercial realities."); *also see* 2 Areeda & Turner, *Antitrust Law*, § 523a, at 358 (1978). As was discussed in the finding of facts, numerous conditions contributed to the State's failure to prove its proposed market boundaries, the least of which was not the State's unwillingness to adhere to a single geographic market theory and its inability to offer any expert testimony on any of its theories.[66] Adding to the State's failure was the defendant's evidence and expert testimony endorsing the existence of numerous markets within the State of New York. The State has not carried its burden of proof with respect to the issue of proving any meaningful relevant geographic market.

Although a failure to prove the relevant market has been regarded as sufficient grounds for holding against the plaintiff, *see Disenos Artisticos E Industriales, S.A. v Work*, 714 F.Supp. 46, the Court is not prepared to ground its holding solely on this basis, but rather finds that the State's inability to prove a relevant market significantly hindered its ability to establish its case-in-chief.

### 2. Market Power

 In addition to the relevant market, the State asserted that market power is not an element of this case. (Plaintiff's Proposed Findings of Fact and Conclusions of Law, at 98). Market power is the ability to raise unilaterally prices and profitably maintain those prices above competitive levels and/or restrict output in the market. *Package Shop, Inc. v. Anheuser–Busch, Inc.*, 675 F.Supp. 894, 939 (D.N.J.1987). Without that ability, when a manufacturer implements an anticompetitive restraint, consumers are able to switch to a competitor's product. Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality*, 48 Chi. L.Rev. 6, 16 (1981), quoted in *Package Shop v. Anheuser–Busch* at 939. The *Sylvania* Court did not perform a rule of reason analysis, and offered little guidance as to how the analysis functions. Although finding market power was not explicitly required in that case, the Court recognized that "interbrand competition . . . . is the primary concern of antitrust law." *Sylvania*, 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19. Unless a manufacturer possesses market power, vertical territorial agreements, although reducing intrabrand choice, are not likely to affect adversely interbrand competition. Posner, *The Next*

---

**66.** The State initially took the position that the relevant market was the entire State of New York, and maintained that position through discovery. It was from this position that the defendant's experts gave their ultimate opinions. When the State altered its position during opening arguments and in its motion to dismiss, it offered no expert testimony to support such a finding.

*Step in the Antitrust Treatment of Restricted Distribution,* at 16. It is therefore consistent with *Sylvania*'s holding that without market power a vertical restraint will not violate the antitrust laws.

■ One practical reason for a court's reliance on market power is that the weighing required by the rule of reason is extremely awkward to apply. Competitive effects are not susceptible to any kind of numerical valuation, making the Court's task a daunting one. Arquit, *Market Power in Vertical Cases,* 60 Antitrust L.J. 921, 922 (1992), citing Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality,* 48 Chi. L.Rev. 6, 8 (1981); Easterbrook, *Vertical Arrangements and the Rule of Reason,* 53 Antitrust L.J. 135, 155 (1984). The *de facto* result has been the implicit implementation of a market power screen: if the relevant market is competitive, no participant will possess market power, and any appreciable procompetitive effect will be deemed sufficient to validate the contested restraint. Arquit, *Market Power Vertical Cases,* at 923; Ginsberg, *Vertical Restraints: De Facto Legality Under the Rule of Reason,* 60 Antitrust L.J. 67 (1991).

There have only been four cases where the relevant market/market power test has been met;[67] in two of which the defendant's market share was in excess of 70%, and in one of which a hybrid vertical agreement was involved.[68] The fourth, the Second Circuit's decision in *Eiberger v. Sony Corp.,* was, in the words of Judge Douglas Ginsberg, an "outlier" case in which the defendant's conduct was found illegal, in spite of possessing merely 12% of the dictation machine market.[69] From the remainder of the cases, it is clear that, regardless of whether the Court explicitly applied a market power screen as a threshold matter, unless the plaintiff proved and the Court determined that the manufacturer had market power in the relevant market, the rule of reason balanced in the defendant's favor. *See, Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 678 F.2d 742 (7th Cir. 1982); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210 (D.C.Cir. 1986); and *Assam Drug Co. v. Miller Brewing Co.,* 798 F.2d 311 (8th Cir.1986) (explicitly requiring a showing of market power); *also see, Donald B. Rice Tire Co. v. Michelin Tire Corp.,* 483 F.Supp. 750 (D.Md.1980), aff'd, 638 F.2d 15 (4th Cir.), cert. denied, 454 U.S. 864, 102 S.Ct. 324, 70

---

67. *See,* Ginsburg, *Vertical Restraints: De Facto Legality Under the Rule of Reason,* 60 Antitrust L.J. 67, 72–73 (1991).

68. The "hybrid" case is *Dimidowich v. Bell & Howell,* 803 F.2d 1473 (9th Cir.1986), in which upon reversing a summary judgment motion, the defendant had only 10–15% of the primary market, but possessed a virtual monopoly on the secondary market, the service of its products. The Court's decision appears to hinge on the possession of monopoly power in the service market. The case is much like *Eastman Kodak Co. v. Image Technical Services, Inc.,* ── U.S. ──, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), in which the Supreme Court distinguished the facts from those in *Sylvania,* stating that, "[u]nlike *Continental T.V.,* this case does not concern vertical relationships between parties on different levels of the same distribution chain."

69. Ginsberg, *Vertical Restraints: De Facto Legality Under the Rule of Reason,* 60 Antitrust L.J. at 72–73. Judge Ginsberg states that "[t]he plaintiff seems to have prevailed in [Eiberger] only because the court erred ..." in not giving serious consideration to the interbrand benefits of the vertical restraint. This failure "... can per-

haps best be explained by the early date at which it was decided."

The Court in *Eiberger* held in response to defendant's argument that the plaintiff must show anticompetitive effects on the industry as a whole (or in other words show intrabrand harm plus market power), "[u]nless we are to conclude that an anticompetitive impact on intrabrand competition cannot alone support a finding that § 1 has been violated—and we see no basis for such a conclusion.... we must conclude that ABP has proven such a violation here." *Eiberger,* 622 F.2d at 1081.

The outcome in *Eiberger* may have resulted more from the case's timing than its factual circumstances. Although the lower court's decision was handed down over a year after *Sylvania* overturned *Schwinn* and its per se standard, the trial occurred while *Schwinn* was still the law of the land. 8 P. Areeda, *Antitrust Law* 480 (1989). Observing the lack of discussion of interbrand market benefits of the restraint, the district court appears not to have weighed all the circumstances as required by *Sylvania.* Most likely, this is due to the close proximity of the decision to *Sylvania.* It was upon the factual findings made under these circumstances that the Circuit Court based its decision.

L.Ed.2d 164 (1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001 (5th Cir.), cert. denied, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981); *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292 (5th Cir.1981); *Davis–Watkins Co. v. Service Merchandise*, 686 F.2d 1190 (6th Cir.1982), cert. denied, 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984); *Cowley v. Braden Industries, Inc.*, 613 F.2d 751 (9th Cir.), cert. denied, 446 U.S. 965, 100 S.Ct. 2942, 64 L.Ed.2d 824 (1980); *Graphic Products Distributors, Inc. v. Itek Corp.*, 717 F.2d 1560 (11th Cir.1983).

In order to determine market power, while the predominant factor appears to be market share, there are numerous relevant factors which the Court must consider, *Hayden Publishing Co.*, 730 F.2d at 68–69, including barriers to entry into the market and the price sensitivity of the market. Posner, *Economic Analysis of Law* 227–228 (2d ed. 1977). Although market share is not the sole determining factor, it appears that without a certain minimum market share a defendant will not be deemed to possess market power.[70] In the present case, A–B's market share in New York State grew from 31% in 1981 to 39% in 1989. In this Court's examination of previous vertical restraints, 39% share is below that which has been deemed sufficient to confer market power in any previous decision.

A second factor in the market power inquiry are the barriers to entry. High barriers to entry can effect the ability of new participants to enter the market and

result in giving the established participants more power in the market. *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir.1986). These barriers are clearly not a significant factor in New York State beer sales, as is exemplified by Coors' successful entry[71] and the 10–15 new entrants into the market every year.

If market power is the ability to raise prices and maintain such prices above competitive levels, than a high degree of price sensitivity in a market exemplifies a lack of market power. (Tr. 3363–3364); *Package Shop, Inc.*, 675 F.Supp. at 940. The sensitivity of A–B products to price increases was attested to by numerous witnesses. If a competitor of A–B lowered its price, sales of A–B dropped. (Tr. 1613). If A–B were to raise its prices 10%, it would lose perhaps as high as 60% of its sales. (Tr. 3366–3374). The high level of price competition in the beer market evidences a lack of market power held by A–B.

In sum, the relatively small market share, lack of entry barriers and the intense price competition all lead the Court to the conclusion the State has not proven that A–B possesses market power. Although the practical effect of this finding, especially when combined a showing of some interbrand benefits, would usually dictate a subsequent finding that the defendant's 1982 Agreement is reasonable, *Eiberger* is binding on this Court. That case, notwithstanding the Court's discussion above, found a non-price vertical restraint unreasonable without finding that the re-

**70.** There do not appear to be any vertical restraint cases in which a possessor of less than 70% of the relevant market possessed market power. See, e.g., *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 26, 104 S.Ct. 1551, 1566, 80 L.Ed.2d 2 (1984) (30% market share insufficient to establish market power); compare, *Graphic Products Distributors, Inc., v. Itek Corp.*, 717 F.2d 1560 (11th Cir.1983) (70–75% share indicative of market power when only a small number of firms divide the remainder shares); and *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980 (5th Cir.1983) (80% market share conferred market power). While the Court recognizes that the standard of market power in a section 1 case may be lower than the standard for monopoly power in a section 2 matter, *Eastman Kodak Co. v. Image Technical*

*Services, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265 (1992), we note that the Second Circuit concluded in *Broadway Delivery Corp. v. United Parcel Serv.*, 651 F.2d 122, 129 (2d Cir.1981), that "sometimes, but not inevitably, it will be useful to suggest that a market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power."

**71.** Coors entered the New York State in mid-1987 and has obtained 7.1% of all sales. Coors Light held 18% of the New York Metropolitan Market in 1990.

straint had any effect on the interbrand market, or in other words that the defendant did not possess market power. *Eiberger*, 622 F.2d at 1081. In light of that holding,[72] and irrespective of the above findings, a complete balancing of the interbrand benefits against the intrabrand effects of the restraint in question is still necessary.

### 3. *Balancing Test*

 The circumstances relevant to a rule of reason analysis were summarized by Justice Brandeis in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):

> "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained ..."

*See Sylvania*, 433 U.S. at 49, 97 S.Ct. at 2557. Applying the rule of reason to nonprice vertical restraints requires weighing the "enhancement of interbrand competition against the restrictive effect on intrabrand competition and determine whether the restraints are, in all circumstances, reasonable." *Eiberger v. Sony Corp.*, 622 F.2d at 1076. The Court must not only examine the effects of the restraint but also the purpose for imposing the restraint,

for although a lawful purpose will not save an otherwise anticompetitive restraint from its unlawful effects, knowledge of the purpose can help courts interpret the effects. *Chicago Board of Trade v. U.S.*, 246 U.S. at 238, 38 S.Ct. at 244; *also see, Borger v. Yamaha International Corp*, 625 F.2d 390 (2d Cir.1980).

"Vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products." *Sylvania*, 433 U.S. at 54, 97 S.Ct. at 2559; *Eiberger*, 622 F.2d at 1075–1076. These efficiencies can be achieved by inducing dealers to invest in capital and labor, engage in promotional activities or provide additional services. These investments may create efficiencies not only in the distribution system but may also affect the manufacturers goodwill and overall competitiveness while also enabling the manufacturer to exert control over the quality of its product. *Sylvania*, 433 U.S. at 55, 97 S.Ct. at 2560. Since the primary interest of antitrust laws is the effect on interbrand competition, these interbrand benefits are of paramount interest to the Court. *Sylvania*, at 50, n. 19, 97 S.Ct. at 2558, n. 19; *Business Electronics, Corp. v. Sharp Electronics, Corp.*, 485 U.S. at 726, 108 S.Ct. at 1520.

As we stated earlier, the Court found A–B's primary purpose in imposing the Equity Agreement was to increase its interbrand competitiveness by causing its wholesalers to distribute more effectively and efficiently while also protecting the quality of its product. It is a legitimate purpose for a manufacturer to implement restraints to seek to improve its position in the interbrand market.[73] *Sylvania*, 433

---

**72.** If *Eiberger* is read narrowly tailored to its facts, the decision holds that in an oligopolist market, a restraint which eliminates intrabrand competition and for which no valid procompetitive reasons are offered and from which no interbrand benefits are found, may violate the antitrust laws without a showing of market power or actual effects on the interbrand market.

**73.** The State's argument, that A–B's leading position in the beer market prohibit it from implementing improvements so to achieve increased profits, is not persuasive. Although A–B is the

leading beer producer in New York State, a position it achieved by offering consumers the desired combination of price and quality, it does not possess monopoly power. In the Second Circuit's *Starter Sportswear* decision the Court found that even a business possessing monopoly power can validly impose vertical restraints that are intended primarily to maximize profits. *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 190 (2d Cir.1992).

The State's also incorrectly asserts that *Eiberger* supports its argument. In *Eiberger*, contrary to the State's claim, the Court did not find

U.S. at 55, 97 S.Ct. at 2560; *Eiberger*, 622 F.2d at 1076.

The State was able to prove only limited anticompetitive effects on intrabrand competition were caused by the implementation of the 1982 Equity Agreement. The Agreement created a distribution system of exclusive territories. Unlike the exclusive territory arrangements of its competitors, the A–B exclusive territories were not "airtight", as exhibited by both transshipping's continued presence and A–B expressly permitting its authorized wholesalers to transact with known transshippers. With the continued presence of transshipping, intrabrand competition was not eliminated, although it was quite predictably temporarily reduced. Such a situation is dramatically different from ones in which all intrabrand competition is completely eliminated. *Graphic Products Distributors, Inc. v. Itek Corp.*, 717 F.2d 1560, 1574 n. 25 (11th Cir.1983); *see also Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 298 (5th Cir. 1981). Courts are more accepting of a less restrictive constraint when a more restrictive alternative was available. *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 461 F.Supp. 1046, 1052 (N.D.Cal.1978), aff'd, 694 F.2d 1132 (9th Cir.1982).

The State also showed that those home distributors practicing transshipping were temporarily and for a short period injured by the Agreement.[74] Although the Equity Agreement did not forbid sales to transshippers, the level of transshipping decreased immediately for a relatively short period after the Amendments became effective. This decrease was due to the prohibition against authorized wholesalers from actively participating in transshipping and from the confusion over the implications of the "indirect sales" clause. The reduction in transshipping lessened its ability to push A–B prices down. But, "a court

applying the Rule of Reason asks whether a practice produces net benefits for consumers...." *Chicago Professional Sports Ltd. Partnership v. National Basketball Assn*, 961 F.2d 667, 674 (7th Cir. 1992). The State's failure to show that price reductions achieved by transshippers were passed on to the consumer diminishes the anticompetitive implications of any reduction in transshipping.

Additionally, by 1986 transshipping had restored itself to nearly pre-agreement levels. As of 1990, more A–B beer was being transshipped than prior to the implementation of the Agreement, demonstrating the temporary nature any injury to the transshippers.

The Equity Agreement arguably caused some increases in A–B beer prices in 1982–1983, although the State failed to prove the extent to which this increase was not attributable to the bottle bill and normal inflationary pressures and instead attributable to the Equity Agreement. For that portion of price increases attributable to the Agreement, it is not clear what portion was a result of decreased transshipping and not the result of procompetitive, yet costly, improvements like the first-in, first-out policy, investment in CEWs, and improved wholesaler services. Simply showing that prices may have increased as a result of the Equity Agreement is not sufficient to prove anticompetitive intrabrand effect. Often, a vertical restraint will result in increased prices due to the expense of performing the desired procompetitive services. *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. at 728, 108 S.Ct. at 1521. This recovery of costs is not evidence of anticompetitive injury. *Id.*

In sum, the State showed some injury to transshippers for a period after the implementation of the Agreement. The present

that Sony's position among the leaders in the market prohibited it from imposing a restraint intended to improve its market share. Rather, the Court merely stated the Sony's "market position completely undercuts any arguments for leniency" based on its "new entrant" status. *Eiberger*, 622 F.2d at 1080–1081. Sony was not entitled to, nor in the present matter is A–B asking for, special leniency. Nevertheless, A–B

will not be barred from implementing pro-competitive policies simply because it happens to be a successful competitor in the past.

**74.** Notwithstanding this fact, it appears that presently all the home distributor witnesses are more profitable today than they had been before the Agreement.

level of transshipping and the profitability of those engaged in it further evidences a lack of present, i.e. permanent injury. The State also showed that the Equity Agreement caused some increases in price, but it did not show that these increases were causally related to the reduction in transshipping. Nor did the State show a continuing injury to consumer prices, since 1987 A–B prices have grown at a rate lower than the consumer price index and since 1982 at a rate below the producer price index. In fact, there was testimony that presently the prices of A–B products is falling. In sum, the State has only proven that A–B prices increased between 1982–1983, in part possibly due to the 1982 Equity Agreement.

Against the limited anticompetitive intrabrand benefits, we must weigh the numerous beneficial effects on interbrand competition caused by the Agreement.

First, the 1982 Amendments helped solidify the wholesalers financial base, enabling them to undertake the expensive investments and activities A–B sought. Producers have a legitimate interest in ensuring that their distributors have the financial ability to implement the policies aimed at making them more effective competitors in the interbrand market. *Sylvania*, 433 U.S. at 55, 97 S.Ct. at 2560; *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 762–763, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). The necessity of ensuring the stability of A–B's wholesalers financial base was affirmed by the wholesaler witnesses who testified that the desired investments would not and could not have been made by without the Equity Agreements and their exclusive territory provisions. *See Business Electronics*, 485 U.S. at 728–729, 108 S.Ct. at 1521–22 (in order for the producer to succeed in its procompetitive goals its wholesalers must first have the ability to pay for the programs).

Second, aside from giving wholesalers the ability to invest, the Equity Agreement mandated certain investments be made. It is legitimate for a producer to induce its wholesalers to invest in what it deems necessary to market more competitively its product. *Trans Sport v. Starter Sportswear*, 964 F.2d at 190; *Sylvania*, 433 U.S. at 55, 97 S.Ct. at 2560. A–B's Agreements caused wholesalers to make extensive investments aimed at enhancing A–B's position in the interbrand market. Large-scale investments were made by wholesalers in CEWs, personnel, their uniforms, product promotions and transportation vehicles. In addition, by making these investments wholesalers had more equity in their business and therefore had the incentive to improve their performance.

Specifically, investments caused actual procompetitive effects by: maintaining and assuring the quality of A–B's product by controlling the transportation of its product and reducing the likelihood that overage beer reached the consumer, see *Sylvania*, 433 U.S. at 55 n. 23, 97 S.Ct. at 2560 n. 23; *Mendelovitz v. Adolph Coors Co.*, 693 F.2d 570, 576 (5th Cir.1982); increasing wholesaler involvement in advertising and promotional activities, see *Sylvania*, 433 U.S. at 55, 97 S.Ct. at 2560; *Starter*, 964 F.2d at 190; increasing the performance of services by wholesalers to customers, see *Sylvania*, 433 U.S. at 55, 97 S.Ct. at 2560; *Business Electronics*, 485 U.S. at 728, 108 S.Ct. at 1521; *Monsanto*, 465 U.S. at 762–763, 104 S.Ct. at 1470; *Copy–Data Systems, Inc. v. Toshiba America, Inc.*, 663 F.2d 405, 410 (2d Cir.1981); enabling wholesalers to distribute more efficiently A–B's products and introduce new brands, see *Sylvania*, 433 U.S. at 54–55, 97 S.Ct. at 2560; *Monsanto*, 465 U.S. at 763–764, 104 S.Ct. at 1470; *Copy–Data*, 663 F.2d at 409–410; and enhancing wholesaler involvement in community relations.

The State argues that additional promotional and advertising activities, as well improved "cosmetics" such as uniforms and newly painted trucks are not procompetitive activities. Although there appears to be some dispute over the competitive benefits of massive advertising, it is clear that the Supreme Court and the Second Circuit recognize some increases in advertising and promotional activity as procompetitive. See *Sylvania*, 433 U.S. at 55, 97 S.Ct. at 2560; *Starter Sportswear*, 964

F.2d at 190. The State did not convince the Court, nor did it submit any evidence (other than its rebuttal expert's testimony) for the Court to consider, that these activities were not procompetitive. Notwithstanding any "expert" testimony to the contrary, given a choice people buy a clean or smartly dressed or groomed product ahead of one that presents a dirty or disheveled appearance.

The Equity Agreement enabled wholesalers to increase their promotional activities and point-of-sale placements. Investments in point of sale displays or promotional efforts are procompetitive when they "convey socially desirable information about product availability, price, quality and services." *Starter Sportswear* at 190; *Sylvania*, 433 U.S. at 56 n. 25, 97 S.Ct. at 2561 n. 25. Even rebuttal witness Bradburd could not dispute that many point of sale displays contain such information. (Tr. 3864–3868). Also, *Starter Sportswear* stated that "[a] business may properly seek to maintain the image of its products by controlling where those products are sold, even if profit maximization is its primary objective.... Moreover, because a good's value 'is a joint product of the manufacturer who makes it and the elite dealer who stamps it with fashionability....'" intrabrand restrictions which convey to consumers a message of quality may not be anticompetitive. *Starter Sportswear* at 190, quoting 8 P. Areeda, *Antitrust Law* ¶ 1613d, pp. 184–185 (1989). Likewise, the State failed to convince the Court that the "cosmetic" actions taken by A–B wholesalers did not convey an image of quality to consumers and thus be deemed procompetitive.

The proof showed that the above mentioned activities beneficially effected interbrand competition. The 1982 Agreement was successful in its attempt to improve the quality of performance by A–B's authorized wholesalers, which added to the quality of A–B's product. Since 1982, A–B's market share in New York State, as well as nationally, has continued to grow.

When weighing the effects of the allegedly illegal restraint, the Court must examine the overall effect the restraint had on competition, interbrand and intrabrand.[75] *Eiberger*, 622 F.2d at 1076. When balanced against the procompetitive interbrand effects the limited intrabrand injury is dramatically outweighed. The intrabrand injury was limited in both scope and duration, while the procompetitive effects were extensive and continue to impact procompetitively on interbrand competition.

Further diminishing the State's anticompetitive assertions is its willingness to settle its case action against other brewers which impose more restrictive terms on their wholesalers than A–B. Were the Court to find A–B's restraint illegal it would place A–B at a competitive disadvantage while its competitors continue to utilize their "airtight" exclusive territory agreements. Antitrust laws are for the protection of competition, not competitors. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). In light of the utilization, without objection, by many other producers of "airtight" exclusive territories, the State may not now claim that A–B's less restrictive Agreement somehow injurious to overall competition.

Parenthetically, it was also shown that transshipping may in many ways be injurious to a producer. Due to this recognized harmful affect, the procompetitive nature of certain vertical restrictions can outweigh even the complete elimination of transshipping and intrabrand competition. *Starter Sportswear*, 964 F.2d 186. A–B's 1982 Agreement only injured transshipping, but unquestionably it did not eliminate it. As Justice Marshall, sitting by designation, stated in *Starter Sportswear*, "[a] business may properly seek to maintain the image of its products by controlling where those products are sold, even if profit maximization is its ultimate objective. It also is legitimate for Starter to select only those retailers willing to make an economic in-

---

**75.** In *Eiberger,* there were no pro-competitive interbrand competitive benefits to weigh against the intrabrand harms. *Eiberger* at 1078 n. 17.

The Court found the restraint unreasonable by weighing significant intrabrand harm against zero interbrand competitive benefits.

vestment in Starter products, while excluding other dealers unable or unwilling to make such a commitment." *Starter Sportswear*, 964 F.2d at 190. A–B imposed its Agreement and promoted interbrand competition with only small and temporary injury to intrabrand competition. There was little evidence that consumers were injured, and those allegedly injured transshippers appear to be functioning profitably today. The overall impact of the 1982 Equity Agreement was and is procompetitive.

### E. The Relief Requested.

■ The State seeks injunctive relief, not damages. For a court to grant injunctive relief in an antitrust case the plaintiff must show current injury or significant threat of immediate harm. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969); *Disenos Artisticos E Industriales, S.A. v. Work*, 676 F.Supp. at 1280. An injunction will not be granted to remedy an injury whose existence has ceased. *See Lefrak v. Arabian American Oil Co.*, 487 F.Supp. 808, 825–826 n. 24 (E.D.N.Y.1980). Any injury the 1982 Agreement might have caused to transshipping has ceased, as exhibited by the current level of A–B beer being transshipped. Any injury incurred through higher prices has also ceased, as exhibited by evidence that current A–B prices are falling and have been rising for the past four or five years at a rate below inflation. It is clear from all the foregoing that the State is not entitled at this juncture at least to any such relief.

Accordingly the State's complaint must be and is now hereby dismissed with costs. Submit judgment on notice.

SO ORDERED.